DORSEY ET AL. *v.* STONE ET AL. EXECUTORS

[No. 83, October Term, 1950.]

*Decided February 9, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Linwood L. Clark* for the appellants.

The Court declined to hear argument for the appellees.

*James Thomas,* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing, on demurrer, on the ground of laches, a bill to establish, as "an implied, constructive trust", an express oral trust, invalid as such under the Statute of Frauds.

The bill alleges that: Plaintiffs' father, Walter B. Dorsey, purchased, with his own funds and subject to mortgages subsequently paid by him or out of his estate, four farms in St. Mary's County, which were placed in the name of his brother, Philip H. Dorsey (defendants' testator), "for the express and sole purpose of creating a trust estate for the benefit of * * * plaintiffs, commencing at * * * Walter's * * * death, subject to any indebtedness; * * * Walter * * * having the utmost confidence and faith in his brother." These properties were caused by Walter to be placed in Philip's name "as security for certain advancements made to * * * Walter." They were conveyed to Philip in 1916 and 1918, each subject to a purchase money mortgage from Philip to the respective grantor; these mortgages were released in 1925, 1924, 1924 and 1919 respectively. Walter before his death was in ill health; he was indebted to Philip as an accommodation endorser on notes made by Walter; desiring to protect Philip from any loss he might suffer as endorser, Walter permitted the properties to remain in Philip's name "with the understanding between the

two brothers that any notes * * * Philip * * * might be called upon to pay as * * * endorser should be a charge upon said farms and the balance, if any, should be turned over to * * * plaintiffs." In order to protect Walter, Philip signed a blank promissory note to Walter with permission to fill in such amount as would be necessary to cover the value of the farms should Philip "fail to carry out or evade the terms of the trust."

Walter died December 11, 1923; Philip and plaintiff Philip, Jr., were his executors. All of the notes on which Philip was endorser "were paid from the proceeds of" Walter's estate, as shown by the executors' account, and Philip was held harmless from any loss by reason of his endorsement. At the time of Walter's death the crops on the farms were marketed and the proceeds, approximately $3,200, "were retained by * * * Philip * * *, as part of said trust." On November 23, 1925 Philip sold the first of the farms for $6,250; after deducting the mortgage, $1,500, the balance of $4,750 Philip "had full use of since November 23, 1925." In 1937 Philip sold a second farm for $4,500; the balance of $3,000 (over and above a $1,500 mortgage) Philip "had full use of since April 2, 1937." Since Walter's death Philip (and later his executors) "continued to operate" the other two farms and "to retain the proceeds, rents and profits therefrom."

Walter prior to his death had full control of the four farms, exercised all the rights of ownership, collecting all rents and revenues, paying all costs of operation, including interest on the mortgages. Plaintiffs and Philip "understood between them that the four farms were owned by [Walter], subject to indebtedness thereon, * * * plaintiffs having confidence and faith in their uncle to handle the trust and not expecting or anticipating his death". Philip died on February 6, 1945. The bill was filed in 1947.

The bill prays (1) "that an implied, constructive trust be imposed upon" the two unsold farms, "in favor of plaintiffs", (4) an accounting "for the proceeds of sale

of the two farms * * * and [for] the rents and profits of all the farms" from the date of Walter's death, and (6) general relief.

We need not attempt to reconcile the contradictory allegations as to the "purpose" of the "trust" and the conveyances and as to ownership of the properties. If the case could not be disposed of on the ground of laches, we should be confronted with the question how a constructive trust could be established from any allegations showing, (a) an original intention not to perform the trust or other fraud on Philip's part in procuring the transfers to him or (b) any preexisting confidential relation. *Trossbach v. Trossbach*, 185 Md. 47, 51-52, 42 A. 2d 905. We shall assume that, aside from the question of laches, the bill does (in some way not clear to us) state a case of constructive trust.

As it appears from the bill that from Walter's death in 1923 till his own in 1945 Philip exercised absolute ownership over the alleged trust property and did nothing to acknowledge the alleged trust, it might well be asked whether plaintiffs are not barred by the Statute of Limitations. *Ridgely v. Pfingstag*, 188 Md. 209, 234-236, 50 A. 2d 587. However, it is unnecessary to decide more than the question of laches.

"Ordinarily the defense of laches involves not mere lapse of time (short of the period of limitations) but also some prejudice to the defendant and must be made by answer showing such facts. If, however, the bill on its face shows both lapse of time and prejudice or such lapse of time and circumstances as suggest prejudice or acquiescence and call for explanation * * * the bill is demurrable. *Salisbury v. Camden Sewer Co.*, 135 Md. 563, 571, 109 A. 333; *Plitt v. Kaufman*, 188 Md. 606, 53 A. 2d 673, 677." *Clarke v. Brunk*, 189 Md. 353, 362, 55 A. 2d 919, 923. See also *Kaufman v. Plitt*, 191 Md. 24, 28-29, 59 A. 2d 634; *Kenny v. Peregoy*, 196 Md. 630, 78 A. 2d 173. The application of this principle and the cases cited in the instant case is too obvious for elaboration. Plaintiffs waited until after Philip's death twenty-

one years after Walter's death. It was suggested at the argument (not in the bill) that delay was excusable because of desire not to disturb pleasant relations with their bachelor uncle. On the facts shown in the bill, plaintiffs had to choose between hope of bounty and claim of right. After having kept silent when they ought to have spoken, they should not now be permitted to speak when they ought to keep silent. *Niven v. Belknap*, 2 Johns., N. Y., 573, 589. As Chief Justice Fuller said, "The hour glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused." *Hammond v. Hopkins*, 143 U. S. 244, 274, 12 S. Ct. 418, 435, 36 L. Ed. 134.

*Decree affirmed with costs.*